## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SONYA OWENS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CV-05-1729 (AK) |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

### DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

Defendant District of Columbia (the "Defendant"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56(b), hereby moves this Court for an order granting summary judgment to Defendant on all claims. Plaintiff has failed to meet her burden of proof on all claims asserted against this Defendant and summary judgment is appropriate. This Court should grant summary judgment as a matter of law for the following reasons:

(1)     Judgment must be entered against Plaintiff on her 42 U.S.C. § 1981 because Plaintiff's employment arises from public appointment rather than a contractual relationship (Count I);

(2)     Most of the Plaintiff's DCHRA claims may be barred by the mandatory notice provision of D.C. Code § 12-309;

(3)     Judgment must be entered against Plaintiff on her District of Columbia Human Rights Act ("DCHRA") discrimination claims because as a matter of law, Plaintiff cannot establish a *prima facie* case of discrimination based on race (black) and gender (female) discrimination (Counts II and III);

(4)    Plaintiff cannot establish a *prima facie* case of retaliation on the bases that she

was retaliated against as a result of engaging in protected activities under the

DCHRA because as a matter of law, there is no causal connection between the

Plaintiff's alleged protected activity and her termination (Count IV); and

(5)    Plaintiff cannot demonstrate a *prima facie* case that the District interfered or

obstructed her rights in violation of the DCHRA (Count V).

A proposed Order also is attached hereto.

Because this is a dispositive motion, no request for Plaintiff's consent is required under

Local Rule 7.1(m).

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General,
Civil Litigation Division

_____/s/Phillip A. Lattimore_____
PHILLIP A. LATTIMORE, III [422968]
Chief, General Litigation Sec. III

_____/s/Nicola N. Grey_____
NICOLA N. GREY [492150]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6626; (202) 727-6295
(202) 727-3625 (fax)
E-mail:  nicola.grey@dc.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SONYA OWENS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CV-05-1729 (AK) |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

(1) Defendant District of Columbia ("the District"), by and through undersigned counsel, submits this Memorandum of Points and Authorities in support of its Motion.

## I.    PRELIMINARY STATEMENT

Plaintiff brings this lawsuit against the District of Columbia for violations of 42 U.S.C. § 1981 and the DCHRA §§ 2-1402.11 and 2-1402.61.  *See* Plaintiff's Complaint ("Complaint"). Plaintiff Sonya Owens is a former Captain with the Metropolitan Police Department ("MPD"). *Id*. at ¶ 4.  Plaintiff alleges that the District retaliated against and subjected her to adverse actions after she testified as a witness at an Equal Employment Opportunity Commission ("EEOC") hearing on behalf of two pregnant MPD officers, in civil depositions, and at a trial of one for the officers, in violation of 42 U.S.C. § 1981 (Count I) and the DCHRA § 2-1402.61 (Count IV). *Id*. at ¶ 104, 120; s*ee also*, Exhibit B, excerpt from Plaintiff's deposition volumes I and II, dated January 11 and 25, 2007, p. 16.  Plaintiff also claims that she was discriminated against because of her race and gender, and subjected to adverse actions, in violation of the DCHRA § 2-1402.11

(Counts II and III).[1]  *See* Complaint at ¶ 109, 115; *see also* Exhibit B p. 14-15, 16, 17.  Finally, Plaintiff claims that the District prevented her from complying with the DCHRA by not immediately contacting her once a subpoena for her appearance for an April 30, 2003, deposition and a February 15, 2005, trial was served in violation of DCHRA § 2-1402 (Count V).

I.    **STATEMENT OF FACTS**

    A.    **The Alleged Retaliatory Acts**

        Plaintiff was appointed to MPD on April 30, 1984, and was employed with MPD for twenty-one (21) years.  *See* Exhibit A, Personnel Form 1; *see also*, Exhibit B p. 12.  She was promoted to Captain in 2000 and was assigned to the Sixth District in September 2000.  *Id.* p. 13, 18, 19.  During her assignment to the Sixth District, Plaintiff was supervised by Commander Willie Dandridge.[2]  *Id.* p. 23, 24.  While at the Sixth District, Plaintiff duties included handling the station, supervising patrol areas, the warrant squad, conducting Commanders' conferences, working the power shift, and with a District neighborhood watch.  *Id.* p. 40.  Plaintiff also had a parking space and access to a take home vehicle.  At one time during the period that Dandridge supervised the Plaintiff, Dandridge assigned Plaintiff to be in charge of the detectives'.  *Id.* p. 40, 45.  After a week, Dandridge removed Plaintiff from supervising the detectives.  *Id.* p. 47.  Plaintiff believes she was removed because she wanted to increase the detective's case closure rate.  *Id.*

        From June 2001 to September 2001, Plaintiff claims that Commander Dandridge told her she was not a "team player," and her routine paperwork became unacceptable.  In addition, she

---

1 Plaintiff also factually alleges that she brought this lawsuit because she was wrongfully terminated.  Plaintiff, however, was not terminated at the time her lawsuit was filed on August 31, 2005.  Plaintiff has not amended her complaint to include a *claim* or *cause of action* for wrongful termination, and therefore, she should not be permitted to raise any claims arising out of her termination here.  *See* Complaint, generally; *see* annexed herewith as Exhibit A, excerpts from Plaintiff's deposition dated January 11, 2007, p. 14
2 Willie Dandridge is currently an Assistant Chief Of Police with MPD.

was removed from conducting Commanders' conferences, and she was not allowed to acquire a "take home vehicle." *See* Exhibit W, Plaintiff § 12-309 notice dated August 12, 2005. Commander Dandridge evaluated Plaintiff as a Captain for the employment performance rating period fiscal year ("FY") of 2000 to 2001, and gave Plaintiff an average rating.[3] *Id*. p. 24, 27, 29. Plaintiff does not allege that she was denied training while at the Sixth District, and in fact, she concedes that she was permitted to attend all of the training that was approved prior to her transfer to the Fifth District. *Id*. p. 50, 55.

In September 2001, Plaintiff was transferred and reassigned to the Fifth District. *See* Exhibit B p. 35-36, 47. During her assignment at Fifth District, Plaintiff was supervised by Commander Jennifer Greene, a black female. *Id*. p. 22, 23. Prior to her transfer, Plaintiff was advised that Greene requested that Plaintiff be transferred to the Fifth District. *Id*. p. 38, 40. After Plaintiff's transfer to Fifth District, Plaintiff's responsibilities shifted, primarily because of the needs of that particular police precinct. Plaintiff did not file a grievance or complaint regarding her transfer from Sixth District to Fifth District. *Id*. p. 42.

In November 2001, Plaintiff was asked to be interviewed as a result of two Equal Employment Opportunity Commission ("EEOC") investigations of discrimination complaints brought by two Sixth District Officers, Sharon Ritchie and Tracy Miles-English. *See* Exhibit C, Letter dated November 21, 2001. Plaintiff was scheduled to be interviewed by the EEOC on November 30, 2001. *Id*.; *see also*, Exhibit B, p. 17, 18, 19. Plaintiff's interview by the EEOC was conducted at the Fifth District. *Id*. p. 18.

---

[3] Plaintiff acknowledged that she did not have evaluations before she became a Captain and did not have an evaluation for the evaluation period ending September 30, 2000, when she was a Lieutenant. *Id*. p. 27-28, 29.

Plaintiff believes that Commander Greene retaliated against her after she was interviewed in November by the EEOC in the Sharon Ritchie and Tracey Miles cases.  *Id.* p. 21, 48. Plaintiff does not, however, believe that Commander Dandridge discriminated or retaliated against her after she was transferred to the Fifth District.  *Id.*, p. 50.  Plaintiff claims in the Fall of 2001, after she was transferred to Fifth District, that she was retaliated against by Greene when she was denied a parking space, training, and access to a vehicle.  *Id.* p. 21, 22, 23, 48.  There is no evidence that Plaintiff complained to any MPD official about being denied parking, training, and access to a take home vehicle for participating in an EEOC investigation on or about November 30, 2001.

While assigned to the Fifth District, Plaintiff received an average rating for the evaluation period that ended in September, 2002.  *See* Exhibit W. p. 2.  Commander Greene evaluated Plaintiff for the 2001 to 2002 evaluation period.  *See* Exhibit B p. 20.

On April 30, 2003, Plaintiff was deposed as a fact witness in a lawsuit filed by Ritchie.  *Id.*, p. 19; *see also*, Exhibit D, Transcript of Plaintiff's April 30, 2003, Deposition, p. 1.

In August 2003, Plaintiff submitted an application for the Certified Public Manager's ("CPM") Program Cohort 17 to Commander Greene.  *See* Exhibit W.  In September 2003, Plaintiff resubmitted an application to Greene when she learned that CWD did not receive her application.  *Id.*  Plaintiff received a rating for performance evaluation period ending September 2003; however, she did not recall but believed she received either an average or below average rating.  *See* Exhibit B p. 30.  In October 2003, Plaintiff resubmitted her application to CWD.  *See* Exhibit W.  In October 2003, while Plaintiff was attending a class at the University of Maryland at College Park (UMCP), Commander Greene ordered Plaintiff to work the day tour.  *See* Exhibit B p. 68-69.  At that time, Plaintiff's tour of duty was served at the leisure of the

Commander Greene. *Id.* p. 69. Plaintiff testified that Greene needed her to work day work. *Id.* p. 70. Plaintiff also concedes that Greene, as the Commander, was allowed to make that assignment. *Id.* Plaintiff did not file a grievance regarding the change of tour or her removal from her class at UMCP. *Id.*

In May 2004, Plaintiff believed that she was accepted into the CPM program. *See* Exhibit B p. 57-58; *see also*, Exhibit W. However, in August 2004, after Plaintiff attended the CPM program at George Washington University for a week, she was removed from the program because her application was incomplete. *See* Exhibit B p. 60-61; *see also* Exhibit W. On August 14, 2004, since Plaintiff had not been accepted to the CPM program, Plaintiff pay status was AWOL for the forty (40) hours she attended the CPM program. *See* Exhibit B p. 63; *see also*, Exhibit W. In the evaluation rating period ending September 2004, Plaintiff received an average rating. *See* Exhibit B p. 115; *see also* Exhibit W p. 4.

### B.    Plaintiff Files EEOC Charge

In 2004, Plaintiff filed an EEOC complaint alleging race discrimination in the work place. In her EEOC complaint, Plaintiff allegedly claimed employment, job and race discrimination. *Id.* In January 2005, Plaintiff testified that she had an interview with the EEOC. The EEOC found that there was insufficient evidence to support Plaintiff's claim of race discrimination. *Id.* p. 22-23.

### C.    The Falsification of the Police Report

Plaintiff worked from May 31, 2004, to June 4, 2004. *See* Exhibit H p. 468. On June 17, 2004, Plaintiff voluntarily surrendered Kona, one of her German shorthair Pointer dogs, to the Animal Welfare League of Arlington ("AWLA"). *See* Exhibit E, Surrender Papers. Plaintiff signed the surrender forms and presented a letter that she had prepared to the "prospective

owner." *Id.*; *see also* Exhibit F, the Letter.  Plaintiff claims that she prepared the letter because it was her intention to give Kona to her mother's friend.

In October 2004, Plaintiff contacted AWLA in an attempt to get her dog back.  *See* Exhibit G, Letter to Greene dated November 11, 2004.  *see also* Exhibit H, excerpts from Plaintiff's Office of Employee Appeal hearing transcript volumes I and II dated October 26, 2006, and November 17, 2006, p. 154.  Ms. Kay Speerstra, the Executive Director of AWLA, stated in a November 11, 2004, letter to Commander Greene that Plaintiff advised her (Speerstra) that Plaintiff's dogs, Kona and Swiss, had been stolen by Plaintiff's pet sitter from Plaintiff's house while she was on vacation.  *See* Exhibit H p. 153; *see also* Exhibit G.

On November 5, 2004, Plaintiff met with Speerstra and provided her with a PD – 251, a police report, as proof of the theft of the dogs and the burglary at her home.  *See* Exhibits G, H p. 154 -155; *see also* Exhibit I, Police Department PD – 251.  Speerstra reviewed the paperwork, which contained a letter that Plaintiff had written to the prospective owners who would adopt Plaintiff's dog, Kona.  Exhibit H p. 154-155.

On that same date, Ms. Susan Sherman and Mr. Art Schwartz, two AWLA employees recognized the Plaintiff as the person who had brought the dog (Kona) to AWLA in June 2004, for adoption.  *Id.*  p. 157, 169.  At that meeting, Plaintiff never identified herself as a police officer.  Instead, she stated that she worked for Microsoft.  *Id.* 157, 166, 169.  The police report also stated that Plaintiff worked at Microsoft.  *Id.*  During the November meeting, Plaintiff advised Speerstra that she used the internet and found out that her dog (Kona) had been adopted from AWLA in Arlington, VA.  *Id.* p. 157-158.  Speerstra found this assertion strange because, Plaintiff's dog (Kona) was adopted in late June or early July, 2004, - - - approximately two weeks after it was brought in, and any information about the dog would have been removed from

the website at the time of the dog's adoption. *Id*. p. 157-159.   According to Speerstra, only information about animals that need a home remains on AWLA's website. *Id*. p. 158.

Concerned, Speerstra contacted Fourth District to find out information about the police report. *Id*. p. 160.   An officer at the Fourth District could not find a record of the police report. *Id*.   However, the officer who was helping Speersta, recognized Plaintiff's name and advised Speerstra that Plaintiff was a MPD employee who was assigned to the Fifth District. *Id*. p. 161.

On November 11, 2004, Speerstra contacted the Fifth District regarding the Plaintiff. *See* Exhibit J, Complaint Summary Sheet; *see also*, Exhibit H, p. 16, 153.  Speerstra stated that Plaintiff brought her dog, Kona, into the animal shelter for adoption in June 2004 and then contacted her several months later because she wanted the dog back. *Id*. p. 16, 154.  A Sergeant from the Fifth District went to AWLA to retrieve the police department report (a PD-251, Exhibit I), the letter signed "Sonya" (Exhibit F), the letter to Greene dated November 11, 2004, (Exhibit G), and copies of the surrender forms for Kona (Exhibit E). *See* Exhibit H, p. 17, 163. These documents were turned over to Commander Greene. *Id*. p. 17.

After reviewing the material, Commander Greene became suspicious about Plaintiff's conduct.  The Commander believed that the police report was false, it appeared that it was written in Plaintiff's handwriting, and it stated that Plaintiff worked for Microsoft. *Id*. p. 17-18. On November 11, 2004, Greene contacted Internal Affairs ("IA") and was advised by IA to place Plaintiff on "no-contact" status. *Id*. p. 17, 18-19; *see also* Exhibit K, Revocation/Restoration of Police Powers and Notice of Duty and Pay Status form.  On November 11, 2004, Plaintiff was placed on no-contact status.  In other words, Plaintiff was permitted to work while in no-contact status. *See* Exhibit H, p. 20.  However, her police powers were revoked and her badge, gun and ID folder were taken away. *Id*.

In November 2004, IA commenced an investigation to determine whether Plaintiff had falsified a police report. *See* Exhibit H. p. 19. While Plaintiff was being investigated, she testified at trial in the civil lawsuit that had been filed by Sharon Ritchie *Ritchie v. D.C. Id.*, p. 17. Ritchie had sued the District of Columbia alleging pregnancy and gender discrimination. On March 3, 2005, Plaintiff was interviewed by IA. Plaintiff denied that she surrendered her dog (Kona) to AWLA and stated that she was out of town from May 31, 2004, to June 4, 2004, when her two dogs were stolen by her pet sitter. Plaintiff stated that her next door neighbor, Skully, called her on her cell phone when she was out of town because the police responded to her house for some unknown reason. *See* Exhibit B p. 144–145. Plaintiff also stated that Skully told her that her dogs were not there when the police came to her house. *Id.* Plaintiff does not recall the name of the dog sitter. *See* Exhibit B p. 146; *see also*, Exhibit H p. 475.

Plaintiff also claimed that the pet sitting service helped her locate her dogs (Kona and Swiss), and that she was able to get Swiss back. *See* Exhibit B p. 164-166; *see* Exhibit H p. 475. Plaintiff testified that she retrieved Swiss from an unknown location in the Maryland. However, Plaintiff refused to provide any information to IA regarding the petting sitting service that allegedly helped her recover "Swiss" because she was bound by a confidentiality agreement. *Id.* p. 475-477.

After the interview, the IA investigator requested Commander Greene to order Plaintiff to provide additional information and documentation to IA because Plaintiff was being uncooperative. *Id.* p. 17, 22. On March 9, 2005, Greene gave Plaintiff a memorandum and ordered Plaintiff to report to IA on March 11, 2005, and provide IA with all requested documentation or information. *See* Exhibit L, Memorandum dated March 9, 2005; *see also*, Exhibit H, p. 22. IA requested that Plaintiff provide the following:

1)    The name, address and telephone number of the police agency that assisted her with the return of her dogs;

2)    The name of the contact person in the police agency; and

3)    The names, addresses, and telephone numbers of all of the Pet Sitting Services that she used in 2004.

*See* Exhibit L.

Plaintiff did not report to IA on March 11, 2005.  *See* Exhibit H p. 22, 25.  Instead, Plaintiff requested eight hours of administrative leave on that day by leaving an envelope with a request for administrative leave in Greene's office.  *Id*. p. 23.  Greene attempted to contact Plaintiff twice to discuss the request for administrative leave.  *Id*. p. 24. However, Plaintiff did not return Greene's phone calls.  *Id*.  Greene denied Plaintiff's request because Plaintiff had not followed proper procedure.  *Id*. p. 23, 24.  Additionally, Plaintiff did not report to her shift that same evening and was declared absent without leave ("AWOL") for that work day.  *Id*. p. 25.

On March 12, 2005, AWLA employee Susan Sherman positively identified Plaintiff from a photo array as the person who surrendered her dog (Kona) in June 2004.  *See* Exhibit O, photo arrays.   On that same date, another AWLA employee, Art Schwartz, also positively identified Plaintiff from a photo array as a person he assisted in the summer of 2004.  *Id*.

On March 15, 2005, Plaintiff failed to report to work.  *See* Exhibit H p. 30.  Plaintiff did not return to work until March 29, 2007.  *Id*. p. 30-31, 185.  During this period of time, Commander Greene attempted to contact Plaintiff and left several messages on her home and cell phones and departmental pager.  *Id*. p. 30-31.  However, Plaintiff failed to return any of Greene's messages.  *Id*.  On March 29, 2005, Greene prepared a final investigative report for an adverse action (CS# 05-0447) regarding Plaintiff's AWOL for eight (8) hours on March 11, 2005.  *Id*. p. 26, 183-184; s*ee also* Exhibit M, report dated April 7, 2005.  The following day, Commander

Greene also prepared a final investigative report and recommendation for an adverse action (CS# 05-0448) on Plaintiff for being AWOL from March 13, 2005 to March 26, 2005 for eighty (80) hours. *See* Exhibit H p. 35; *see also*, Exhibit N, report dated April 7, 2005. Greene surmises that Plaintiff did not report to work from March 13, 2005, to May 26, 2005, because Plaintiff incorrectly believed that she was serving a suspension, Greene could not confirm Plaintiff's beliefs because Plaintiff failed to return Greene's messages.[4] *See* Exhibit H p. 30-31, 34–35.

On March 29, 2005, Inspector Matthew Klein, Director of IA, ordered Plaintiff to respond to IA and provide his department with the outstanding requested information. *See* Exhibit H p. 185. Plaintiff reported to IA but refused to answer IA's questions. *Id*. p. 175. IA investigator Theresa Ostazeski conducted the investigative interview. After her investigation, Ostazeski found the following:

1) the PD - 251 was fraudulent and that the CCN# 147-113 was actually assigned to a different report for an attempt to locate and not a burglary;

2) the officer who allegedly prepared the PD 252, badge #3671, did not exist and the badge number was not assigned to anyone;

3) the sergeant who allegedly signed the PD 251, Brown, badge #S331, did not exist at Fourth District and the badge number was assigned to Sergeant Wayne Rimal who was assigned to the Forensic Science Division and not the Fourth District;

4) no detective by the name of Ivey worked at Fourth District at that time. There were two MPD members named Ivey who worked in S.O.C.C., and the Harbor;

---

[4] Prior to the IA investigation, Plaintiff was disciplined as a result of being AWOL for forty (40) hours when Plaintiff attended a program she was not approved for. *Id*. p. 33. Plaintiff received a copy of the suspension letter that notified Greene that Plaintiff would be suspended effective March 13, 2005, unless the imposition of the suspension created operational difficulties for the unit. *See* Exhibit N. At that time, it was Commander Greene's intention that Plaintiff would start her suspension after IA completed their inspection so not to create operational difficulties for IA. *See* Exhibit H p. 34, 39-40. Commander Greene stated that as a Captain, Plaintiff should have known that her suspension would not have begun on March 13, 2005, because Plaintiff had not been served with a PD77 (Revocation/Restoration of Police Powers and Notice of Duty Status) form, and all attempts to contact Plaintiff from March 13, 2007, to March 28, 2007, failed. *Id*. p. 37-41.

5) No technician named Gainer was assigned to Forensic Science at the time of the alleged theft and the only MPD member named Thomas Gainer worked for Fifth District;

6) The property book number 118, which is listed on the PD 25, did not match any Fourth District property book that was in use during that time period;

7) A check of the CCN logbook reveals no call for service or report taken for 1325 Ingraham Street, Northwest, which is Captain Owens' residence, during 2004;

8) A computer check of WALES (Washington Area Law Enforcement System) revealed that there were no calls for police service by any complainant named S. Owens or Sonya Owens, at 1325 Igraham Street, Northwest, during 2004;

9) A comparison of the handwriting on both the AWLA.'s surrender forms and the D.C. Animal Shelter's adoption form appeared to be identical to known samples of Captain Owens' handwriting;

10) Staff members immediately identified Sonya Owens as the person who came to the AWLA in October, and who also had surrendered the dog (Kona) earlier in June;

11) Captain Owens listed Microsoft as her employer on the PD 251; and

12) Captain Owens purported that she was out of town when her house was burglarized and her dogs stolen from May 31, 2004 to June 4, 2004. The PD 251 that she presented to the AWLA reflects a time period from 1400 hours on May 31, 2004 until 2230 hours on June 4, 2004. *See* Exhibit I. However, according to TACIS (Time & Attendance Court Information System), Captain Owens worked the following hours:

    1.  0730 to 1600 hours on Tuesday, June 1, 2004
    2.  0730 to 1600 hours on Wednesday, June 2, 2004
    3.  0730 to 1600 hours on Thursday, June 3, 2004
    4.  0930 to 1800 hours on Friday, June 4, 2004

*See* Exhibit P, final investigation report and recommendation dated April 4, 2005.

At the conclusion of her investigation, Ostazeski recommended that the charges against Plaintiff be sustained and that Plaintiff be cited for adverse action as a result of those charges. *Id*. On April 4, 2005, IA prepared a final investigative report and recommendation for an adverse action (CS# 04-1880) as a result of IA investigation regarding AWLA. *Id*.

### D.    Disciplinary Action Taken Against Plaintiff For Falsifying Documents

On May 3, 2005, Plaintiff was served with a Notice of Proposed Adverse Action to terminate her employment with MPD. *See* Exhibit Q, Notice dated April 25, 2005. The notice informed Plaintiff that she had twenty-one days to submit a response and state whether she desired a hearing. *See* Exhibit H p. 189–190. In the interim, by notice dated August 12, 2005, Plaintiff served her notice of intent to file a lawsuit against the District pursuant to DC Code §12-309. *See* Exhibit W.

Plaintiff's hearing on the charges against her was held on August 15, 2005, and September 12, 2005. *See* Exhibit H p. 190. Plaintiff filed this civil action on August 31, 2005. *See* Complaint. Plaintiff failed to attend the September 12, 2005, hearing, and the charges were heard before a panel in Plaintiff's absentia. *See* Exhibit H, p. 190. On October 14, 2005, after the conclusion of Plaintiff's August and September 2005, hearings, the panel found Plaintiff guilty by a preponderance of the evidence on the charges of:

1) Fraud in securing appointment of falsification of official records or reports;

2) Untruthful statement;

3) Willfully disobeying orders or insubordination;

4) Conduct unbecoming an officer; and

5) Conviction; and

6) AWOL.

*Id.* The panel determined that Plaintiff's employment would be terminated effective November 25, 2005. *See* Exhibit R.

Plaintiff was served with the final notice of adverse action. *Id.* The notice informed Plaintiff that she had ten (10) days to appeal this action to the Chief of Police. *Id.* On October

24, 2005, Plaintiff filed an employee appeal to Chief of Police Charles H. Ramsey challenging the decision to terminate her employment from MPD. *See* Exhibit T, Plaintiff's appeal.

On November 10, 2005, Chief Ramsey denied Plaintiff's appeal. *See* Exhibit U, Ramsey's November 10, 2005, denial. On November 28, 2005, Plaintiff appealed to the Office of Employee Appeals ("OEA"). *See* Exhibit V. Plaintiff's appeal is currently pending before that office.

In February 2005, Plaintiff was notified by MPD and received a subpoena to testify at the *Ritchie v. D.C.* Plaintiff testified on that same day. *See* Exhibit B p. 17; *see also* Exhibit W.

## II.    STANDARD OF REVIEW

Summary judgment must be granted if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Although the party moving for summary judgment has the burden of demonstrating the absence of any material facts and the right to judgment as a matter of law, the movant is not obligated to present supporting evidence. *Ferguson v. District of Columbia*, 629 A.2d 15, 19 (D.C. 1993). Instead the moving party need only assert that there is a lack of necessary evidence to support Plaintiff's case. At that point, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact. *Id.; Beard v. Area Transit Authority,* 631 A.2d 387, 390 (D.C. 1993). Theoretical speculations, unsupported assumptions, and conclusory allegations do not rise to the level of a genuine issue of fact. *Id.*

A movant is entitled to summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *Bowers v. NCAA,* 9 F. Supp.2d 460, 471 (D.N.J. 1998) Once

the movant has discharged his burden, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also, Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986) ("by its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . ; the requirement is that there be no genuine issue of material fact") (emphasis in original).  Although all reasonable inferences are drawn in favor of the non-movant, that party "bear[s] the burden of pointing to 'affirmative evidence' establishing a genuine factual dispute." *Coward v. ADT Security Sys., Inc.*, 140 F.3d 271, 273 (D.C. Cir. 1998).

## II.    ARGUMENT

### A.    Judgment Must be Entered Against Plaintiff on Her 42 U.S.C. § 1981 Retaliation Claim (Count I) Because Plaintiff's Employment Arises From Public Appointment Rather Than a Contractual Relationship.

Plaintiff does not have a claim for retaliation under § 1981 because she has not suffered an impaired contractual relationship.  Section 1981 protects the equal right of "all persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race.  42 U.S.C. § 1981(a).  The statute currently defines "make and enforce contracts" to "include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 126 S. Ct. 1246, 1249 (2006).

As a matter of law, public employees do not have a contractual relationship with their employer.  Because public employees serve by appointment, their rights "must be determined by

reference to the statutes and regulations [governing their employment], rather than to ordinary contract principles." *Kizas v. Webster*, 707 F.2d 524, 535 (D.C. Cir. 1983). "Though a distinction between appointment and contract may sound dissonant in a regime accustomed to the principle that the employment relationship has its ultimate basis in contract, the distinction nevertheless prevails in government service." *Id.* Instead of employment based on a contractual relationship, District employees are appointed to public service, and their employment is governed by a comprehensive set of statues and regulations. *See, e.g.*, Comprehensive Merit Personnel Act, D.C. Code § 1-601.01 *et seq.*; D.C. Code § 5-105.01 ("The Mayor of said District shall appoint to office, assign to such duty or duties as he may prescribe, and promote all officers and members of said Metropolitan Police force. . . .").

Because Plaintiff's position in with MPD was by public appointment, Plaintiff does not have a contractual relationship with the District of Columbia. Therefore, Plaintiff cannot have suffered an impaired contractual relationship based on retaliation, and the Defendant is entitled to summary judgment on Plaintiff's § 1981 claims.

**B.    Plaintiff's DCHRA Claims Under Counts II, III, IV and V May be Barred by the Mandatory Notice Provision of D.C. Code § 12-309.**

Most of the Plaintiff's DCHRA claims are barred by the mandatory notice provisions of D.C. Code § 12-309. Pursuant to § 12-309:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.

The requirement of compliance with the time limit specified in § 12-309 is strict, absolute, and unqualified. In *District of Columbia v. Dunmore*, the D.C. Court of Appeals held that § 12-309 must be construed narrowly against claimants, writing:

> Section 12-309 is not, and does not function as, a statute of limitations. Rather, it imposes a notice requirement on everyone with a tort claim against the District of Columbia, and compliance with its terms is "mandatory as a prerequisite to filing suit against the District."

662 A.2d 1356, 1359 (D.C. 1995) (internal citations omitted).

In this case, Plaintiff's claims that arose prior to February 12, 2005, are barred by § 12-309 because they occurred over six months prior to Plaintiff giving her August 12, 2005, notice to the Mayor. *See* Exhibit W. Thus, Plaintiff's claims regarding her transfer from the Fifth District to the Sixth District in September 2001, her denial of training, a take home vehicle, and a parking space in Fall 2001, and her removal from the supervision of the detectives at Sixth District in 2001, all adverse actions occurring prior to February 12, 2005, cannot be maintained and are barred by the mandatory notice statute. As such, her DCHRA claims relying on these facts are subject to the requirements of § 12-309, and the District is entitled to judgment as a matter of law on all such claims that rely on these facts.

**C.**    **Judgment Must be Entered Against Plaintiff on Her District of Columbia Human Rights Act ("DCHRA") Discrimination Claims Because as a Matter of law, Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination Based on Race (Black) and Gender (Female) (Counts II and III).**

The DCHRA prohibits an "employer" from discriminating against its employees. D.C. Code § 2-1401.02 (formerly D.C. Code § 1-2502). In analyzing a claim of employment discrimination under the DCHRA, courts look to Title VII and its jurisprudence. *Regan v. Grill Concepts-D.C., Inc.,* 338 F. Supp. 2d 131 (D.D.C. 2004).

Such discrimination actions are governed by the familiar burden shifting framework announced in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Paquin v. Federal National Mortgage Assoc.*, 362 U.S. App. D.C. 224, 119 F.3d 23, 27 (D.C. Cir. 1997); *Brodetski v.*

*Duffey*, 199 F.R.D. 14 (D.D.C. 2001).[5]  First, a Plaintiff must establish by a preponderance of the evidence, a *prima facie* case of discrimination.  *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Aka v. Washington Hosp. Ctr.,* 332 U.S. App. D.C. 256, 156 F.3d 1284, 1288 (D.C. Cir. 1998).[6]  To establish a *prima facie* case of discrimination, a Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse personnel action; and (3) an unfavorable action gives rise to an inference of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *Brown v. Brody*, 339 U.S. App. D.C. 233, 199 F.2d 446, 452 (D.C. Cir. 1999).

Once the Plaintiff has established a *prima facie* case, the burden shifts to the Defendant "to articulate some legitimate, nondiscriminatory reasons for the challenged employment decision." *Aka*, 156 F.3d at 1288.  This is simply a burden of production, not one of proof. *Burdine*, 450 U.S. at 255.

Once the Defendant has stated a legitimate, nondiscriminatory reason for its decision, the burden shifts again to the Plaintiff to establish that the articulated reason is pretexual. *Burdine*, 450 U.S. at 253; *Aka*, 156 F.3d at 1288.  The Plaintiff must establish both that the reason is false and that discrimination was likely the real reason. *Aka*, 156 F.3d at 1290-94.

### 1.    Plaintiff Has Not Established a *Prima Facie* Case of Race Discrimination.

Although, Plaintiff satisfies one element as outlined in *McDonnell Douglas*, i.e., she is a black American, and thus a member of a protected class, there is no evidence that Plaintiff was terminated from District service because of her race.  In this case, Plaintiff has not suffered an

---

5  In considering claims of discrimination under the District of Columbia Human Rights, Act, D.C. Code Ann. § 1-2501 et seq.  (1966), District of Columbia Courts employ the three-part McDonnell Douglas burden shifting test articulated by the United States Supreme Court for Title VII cases. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

adverse action.  First, on October 14, 2005, Plaintiff was served with the final notice of adverse

action.  Second, the notice informed Plaintiff that she had ten (10) days to appeal this action to

the Chief of Police.  Third, on October 24, 2005, Plaintiff filed an employee appeal to Chief of

Police Charles H. Ramsey challenging the decision to terminate her employment from MPD.

*See* Exhibit T.  Fourth, on November 10, 2005, Chief Ramsey denied Plaintiff's appeal.  *See*

Exhibit U.  Fifth, on November 28, 2005, Plaintiff appealed to the Office of Employee Appeals

("OEA") after she received the notice of termination.  *See* Exhibit V.  Sixth, Plaintiff's appeal is

currently pending before the OEA.  Finally, since Plaintiff's OEA appeal is still pending, and

there has been no final determination on her termination; consequently, Plaintiff has not suffered

an adverse action, and thus, Plaintiff cannot establish a *prima facie* case and the District is

entitled to judgment as a matter of law.

 Even if this Court determined that Plaintiff  is a member of a protected class, and suffered

an adverse action at the time she was served with the final notice of adverse action (impending

termination), Plaintiff is unable to establish and that the final notice of adverse action gives rise

to an inference of race discrimination because the District had a legitimate non-discriminatory

reason for noticing Plaintiff for termination.  Here, the undisputed evidence will establish that the

District's actions were lawful.  In this case, Plaintiff was found guilty after an IA investigation

of: 1) Fraud in securing appointment of falsification of official records or reports; 2) Untruthful

statement; 3) Willfully disobeying orders or insubordination; 4) Conduct unbecoming an officer;

5) Conviction; 6) and AWOL.

 Plaintiff was engaged in inappropriate conduct when as a sworn Captain of the police

force she falsified an official police document (PD-251) in the hope of deceiving Ms. Speerstra,

the Executive Director of AWLA, to get her dog (Kona) back after she voluntarily put it up for adoption. There was evidence that the handwriting on the PD – 251, was Plaintiff's handwriting.

Plaintiff not only misrepresented herself to Ms. Speerstra and stated that she was an employee with Microsoft, Plaintiff also included that fabrication in her fraudulent police report. Plaintiff never identified herself as a police officer to Ms. Speerstra. The IA investigation determined that the PD - 251 was fraudulent and that the report's CCN# 147-113 was actually assigned to a different report for an "attempt to locate" and not a burglary. In addition, the officer who allegedly prepared the PD - 251, badge #3671, did not exist, and the badge number on the PD – 251 form was not assigned to any officer. The investigation also found that even though there was information to the effect on the PD – 251, there was no Sergeant by the name of Brown, badge #S331, working with MPD, and no detective by the last name Ivey worked at the Fourth District, or technician named Gainer, was assigned to Forensic Science at the time of the alleged theft.

In addition, there were no records of any call for MPD service taken from or for Plaintiff's residential address of 1325 Ingraham Street, Northwest, or for a S. Owens or Sonya Owens, for the year of 2004. The District's findings were supported by several independent witnesses. Plaintiff was identified by AWLA Staff members who identified Sonya Owens in November 2004, as the person who came to the AWLA, and who also had surrendered the dog (Kona) earlier that same year in June.

Moreover, Plaintiff purported that she was out of town when her house was burglarized and her dogs stolen from May 31, 2004 to June 4, 2004. In fact, the PD - 251 that she presented to the AWLA reflects a time period when the dogs were stolen from 1400 hours on May 31, 2004 until 2230 hours on June 4, 2004. *See* Exhibit I. However, Plaintiff could not have been out of town

during the alleged theft of her dogs.  According to TACIS (Time & Attendance Court Information

System), Captain Owens worked the following hours:

> 1.    0730 to 1600 hours on Tuesday, June 1, 2004
> 2.    0730 to 1600 hours on Wednesday, June 2, 2004
> 3.    0730 to 1600 hours on Thursday, June 3, 2004
> 4.    0930 to 1800 hours on Friday, June 4, 2004

*See* Exhibit P, final investigation report and recommendation dated April 4, 2005.

Additionally, Plaintiff does not dispute that the information contained in the PD-251 was

fraudulent. The PD – 251 was  a document in Plaintiff's custody and control that was produced

to the District by the Plaintiff.  Plaintiff not only refused to participate fully with the IA

investigation, she disobeyed orders when she refused to answer IA questions.  Plaintiff's action

of creating the fraudulent police report hinged on criminal conduct that could have been

prosecuted.

Plaintiff has also failed to establish that the two AWOLs in March 2005, give  rise to an

inference of discrimination based on Plaintiff's race because the District had a legitimate non-

discriminatory reason for adjusting Plaintiff's status to AWOL.  First, Plaintiff's attendance

status was properly charged as AWOL for March 11, 2005.  Plaintiff, who was ordered to report

to IA, did not report on March 11, 2005.  *See* Exhibit H p. 22, 25.  Instead, Plaintiff failed to

follow proper procedure and improperly requested eight hours of administrative leave on that

same day by leaving an envelope with a request for administrative leave in Greene's office.  *Id*.

p. 23.  Plaintiff did not report to her tour of duty on March 11, 2005, even though her request for

leave was not approved.  Greene's attempts to contact Plaintiff twice to discuss the request for

administrative leave were also unsuccessful. *Id*. p. 24. As a Captain, Plaintiff is aware of the

proper procedure for requesting leave.

Second, in March 2005, Plaintiff was found to be AWOL from March 13, 2005 to March 26, 2005 for eighty (80) hours. *See* Exhibit H p. 35; *see also*, Exhibit N. Again, Plaintiff failed to follow proper procedure and attempted to serve a suspension regarding another matter from March 13, 2005, to March 26, 2005. As a Captain, Plaintiff is aware of the proper procedures and has in her role as a Captain, utilized those same procedures. Plaintiff was never served with a PD-77 and should have known that her suspension did not commence on March 13, 2005. *See* Exhibit H p. 30-31, 34–35. In sum, Plaintiff has failed to establish a *prima facie* case of discrimination based on race.

Finally, Plaintiff failed to appear on September 12, 2005, the second day of her hearing before the panel. At the conclusion of that hearing, the Panel found Plaintiff guilty by a preponderance of the evidence on the charges of:

1) Fraud in securing appointment of falsification of official records or reports;

2) Untruthful statement;

3) Willfully disobeying orders or insubordination;

4) Conduct unbecoming an officer; and

5) Conviction; and

6) AWOL.

*See* Exhibit R.

In sum, The Plaintiff has not discovered or produced a shred of evidence to suggest that this reason for her notice of adverse action to terminate her from District service was false. As such, the District is entitled to judgment as a matter of law.

**2.     Plaintiff Has Not Established a *Prima Facie* Case of Gender Discrimination.**

Plaintiff has also failed to establish a *prima facie* case of gender discrimination. Although Plaintiff satisfies one element as outlined in *McDonnell Douglas*, i.e., she is a female, and thus a member of a protected class, there is no evidence that Plaintiff was noticed for termination from District service because of her gender.  As discussed above, Plaintiff has not suffered an adverse action because there has not been a final determination of her OEA appeal that is currently pending, and therefore, the District is entitled to judgment as a matter of law because with no evidence to establish this element, there can be no *prima facie* case of gender discrimination. .

Even if this Court determined that Plaintiff is a member of a protected class, and suffered an adverse action at the time she was served with the final notice of adverse action, Plaintiff is unable to establish and that the final notice of adverse action gives rise to an inference of gender discrimination.  Again, the District had a legitimate non-discriminatory reason for noticing Plaintiff for termination.  As discussed above, the undisputed evidence clearly establishes that the District's actions were lawful.  First, Plaintiff was noticed adverse action only after the IA investigation found that Plaintiff engaged in an elaborate scheme to deceive the District and the public when she attempted to get her dog back.  Second, in order to advance her scheme, Plaintiff prepared a false police report and repeatedly lied to the public and her superiors about her conduct.  Third, Plaintiff disobeyed orders and refused to cooperate with the IA investigation.  Fourth, Plaintiff was properly declared AWOL for failing to follow proper procedure on March 11, 2005, and from March 13, 2005 to March 26, 2005.

In sum, The Plaintiff has not discovered or produced a shred of evidence to suggest that this reason for her notice of adverse action to terminate her from District service was false.  As such, the District is entitled to judgment as a matter of law.

**D.      Judgment Must be Entered Against Plaintiff on Her District of Columbia Human Rights Act ("DCHRA") Retaliation Claims Because as a Matter of law, Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation For Engaging in a Protected Activity (Count IV).**

Under the District of Columbia Human Rights Act (DCHRA), "it is unlawful for an employer to retaliate against an employee due to his opposition to any practice made unlawful by the DCHRA." *Regan,* 338 F. Supp. 2d 131 (D.D.C. 2004).  Retaliation actions are also governed by the burden shifting framework announced in *McDonnell Douglas,* 411 U.S. 792 (1973); *Paquin*, 362 U.S. App. D.C. 224, 119 F.3d 23, 27 (D.C. Cir. 1997); *Brodetski*, 199 F.R.D. 14 (D.D.C. 2001).

To establish a *prima facie* case of retaliation, the plaintiff must establish: "(1) that he engaged in statutorily protected activity; (2) that adverse personnel action was taken by the employer against the plaintiff; and (3) that a causal connection exists between the two." *Regan,* 338 F. Supp. 2d 131 (D.D.C. 2004).

"Causation is often demonstrated by temporal proximity between the statutorily protected activity and the adverse personnel action. When the temporal proximity is relatively close, the court can infer causation. When the temporal proximity is extremely close, it raises a strong inference that there is a causal connection between the two." *Id.*  "[T]he plaintiff may establish a causal connection by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity. To qualify as a causal connection, however, the temporal proximity between the employer's knowledge of the protected activity and the adverse personnel action must be very close. *Jones v. Greenspan,* 402

F. Supp. 2d 294 (D.D.C. 2005). A time gap of three to four months is too large for a plaintiff to establish the temporal proximity required to show that an allegedly retaliatory action is causally connected to his protected activity. *Id*.

Under the District of Columbia Human Rights Act, once a plaintiff has established a *prima facie* case of retaliation, the burden shifts to the defendant to show that there were, in fact, non-discriminatory reasons motivating its actions. *Regan*, 338 F. Supp. 2d 131 (D.D.C. 2004).

If a plaintiff establishes a *prima facie* case of retaliation, a presumption then arises that the employer unlawfully discriminated against the employee. To rebut this presumption, the employer must articulate a legitimate, nondiscriminatory reason for its action. The employer need not persuade the court that it was actually motivated by the proffered reasons. Rather, the employer must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Jones*, 402 F. Supp. 2d 294 (D.D.C. 2005).

In this case, Plaintiff is able to establish the first element. Plaintiff testified in *Ritchie v. D.C.*, in February 2005.[7] Plaintiff, however, is unable to establish a *prima facie* case because there has not been a final determination of Plaintiff's termination since this matter is currently pending on appeal before the OEA. Therefore, the District is entitled to judgment as a matter of law.

Even if this Court determined that there was an adverse action, the adverse action is not causally connected to a statutorily protected activity. Plaintiff did engage in statutorily protected

---

[7] First, as previously argued, any claims regarding Plaintiff's testimony at the EEOC hearing and depositions, are barred by DC Code § 12-309.

activity by testifying as a witness in the *Ritchie* matter in 2005, there is no causal connection between Plaintiff's testimony at the *Ritchie v. D.C.* trial in February 2005 and the notice of adverse action, which arose out of Plaintiff's conduct in October and November 2004 when she falsified a police report.  In fact, all of Plaintiff's guilty charges, except for the March 13, 2005 to March 26, 2005, AWOL, were the result of or related to her October and November 2004, conduct.

Moreover, there is not causal link between the Plaintiff's February 2005, testimony and the March 13, 2005, to March 26, 2005, 80 hour AWOL.  The 80 hour AWOL was related to a 2004, disciplinary action that occurred before February 2005.  In 2004, Plaintiff was disciplined as a result of being AWOL for 40 hours.  Plaintiff appealed and at the conclusion of her appeal, it was proposed to Commander Greene that Plaintiff be suspended form March 13, 2005, to March 26, 2005, unless the suspension would create operating difficulties.  Greene determined that a suspension during that time period would create operational difficulties and decided that she would not serve Plaintiff with notice of the suspension for that time period.  Plaintiff, who had not been noticed of the suspension by being served with a PD-77, improperly served the suspension.  Since Plaintiff improperly served the suspension, it was determined that Plaintiff was AWOL for 40 hours.

Moreover, as argued above, Defendant had a legitimate, non-discriminatory reason for subjecting the Plaintiff to the adverse actions and Plaintiff is unable to demonstrate that Defendant's legitimate, nondiscriminatory reasons for the notice of adverse action was pretextual or false.  In sum, the Plaintiff has not discovered or produced a shred of evidence to suggest that this reason for her notice of adverse action to terminate her from District service was false.  As such, the District is entitled to judgment as a matter of law.

**E.**    **Plaintiff Cannot Demonstrate a *Prima Facie* Case That the District Interfered or Obstructed Her Rights in Violation of the DCHRA (Count V).**

DCHRA § 2-1402.11 provides in part, "(a) General. -- It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the actual or perceived: race, ... [and] sex … of any individual: …. (1) By an employer. – … to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee;" and "(4) By an employer, employment agency or labor organization. (A) To discriminate against any individual in admission to or the employment in, any program established to provide apprenticeship or other training or retraining, including an on-the-job training program… ."  DCHRA, § 2-1402.61(c) provides that "[I]t shall be an unlawful discriminatory practice for any person to cause or coerce, or attempt to cause or coerce, directly or indirectly, any person to prevent any person from complying with the provisions of this chapter.

First, as discussed above, Plaintiff's claim prior to February 12, 2005, that the District prevented her from being deposed as a witness in 2003, is barred because Plaintiff failed to comply with the mandatory notice provisions of DC-Code § 12-309.  Second, the District has not violated Plaintiff's rights under DCHRA § 2-1402.11 (a)(4)(A), because Plaintiff has failed to produce any evidence that the District  caused or coerced, or attempted to cause or coerce, directly or indirectly, Plaintiff from complying with the provisions of the chapter.  Here, the evidence shows that, Plaintiff testified in the February 2005, trial and was notified of a subpoena

commanding her to testify at the trial. Therefore, the District is entitled to judgment as a matter of law.

WHEREFORE, the District respectfully requests that the Court grant summary judgment in favor of the District.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General,
Civil Litigation Division

_/s/Phillip A. Lattimore_
PHILLIP A. LATTIMORE, III [422968]
Chief, General Litigation Sec. III

_/s/Nicola N. Grey_
NICOLA N. GREY [492150]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6626; (202) 727-6295
(202) 727-3625 (fax)
E-mail:  nicola.grey@dc.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SONYA OWENS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CV-05-1729 (AK) |
| DISTRICT OF COLUMBIA, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DISTRICT OF
COLUMBIA'S MOTION FOR SUMMARY JUDGMENT**

Comes now, the defendant, by and through undersigned counsel and pursuant to F.R.C.P. 56, and hereby submits the following statement of material facts as to which there is no genuine issue:

**A.    The Alleged Retaliatory Acts**

1. Plaintiff was appointed to MPD on April 30, 1984, and was employed with MPD for twenty-one (21) years. *See* Exhibit A, Personnel Form 1; *see also*, Exhibit B p. 12.

2. She was promoted to Captain in 2000 and was assigned to the Sixth District in September 2000. *Id.* p. 13, 18, 19.

3. During her assignment to the Sixth District, Plaintiff was supervised by Commander Willie Dandridge.[8] *Id* p. 23, 24. While at the Sixth District, Plaintiff duties included handling the station, supervising patrol areas, the warrant squad, conducting Commanders' conferences, working the power shift, and with a District neighborhood watch. *Id.* p. 40. Plaintiff also had a parking space and access to a take home vehicle. At one time during the period that Dandridge supervised the Plaintiff, Dandridge assigned Plaintiff to be in charge of the

detectives'. *Id.*, p. 40, 45. After a week, Dandridge removed Plaintiff from supervising the detectives. *Id.*, p. 47.

4. Commander Dandridge evaluated Plaintiff as a Captain for the employment performance rating period fiscal year ("FY") of 2000 to 2001, and gave Plaintiff an average rating.[9] *Id.*, p. 24, 27, 29.

5. In September 2001, Plaintiff was transferred and reassigned to the Fifth District. *See* Exhibit B p. 35-36, 47. Plaintiff was not denied training while at the Sixth District, and was permitted to attend all of the training that was approved prior to her transfer to the Fifth District. *Id.* p. 50, 55**.** During her assignment at Fifth District, Plaintiff was supervised by Commander Jennifer Greene, a black female. *Id.* p. 22, 23.

6. Prior to her transfer, Plaintiff was advised that Greene requested that Plaintiff be transferred to the Fifth District. *Id.* p. 38, 40.

7. Plaintiff did not file a grievance or complaint regarding her transfer from Sixth District to Fifth District. *Id.* p. 42.

8. In November 2001, after Plaintiff was transferred from the Sixth to the Fifth District, Plaintiff was asked to be interviewed as a result of two Equal Employment Opportunity Commission ("EEOC") investigations of discrimination complaints brought by two Sixth District Officers, Sharon Ritchie and Tracy Miles-English. *See* Exhibit C, Letter dated November 21, 2001. *Id.*

---

8 Willie Dandridge is currently an Assistant Chief Of Police with MPD.

[9] Plaintiff acknowledged that she did not have evaluations before she became a Captain and did not have an evaluation for the evaluation period ending September 30, 2000, when she was a Lieutenant. *Id.*, p. 27-28, 29.

9.  Plaintiff was scheduled to be interviewed by the EEOC on November 30, 2001.  *Id.*; *see also*, Exhibit B, p. 17, 18, 19.  Plaintiff's interview by the EEOC was conducted at the Fifth District.  *Id.* p. 18.

10.  Plaintiff claims in the Fall of 2001, after she was transferred to Fifth District, she was retaliated against by Greene when she was denied a parking space, training, and access to a vehicle.  *Id.* p. 21, 22, 23, 48.  There is no evidence that Plaintiff complained to any MPD official about being denied parking, training, and access to a take home vehicle for participating in an EEOC investigation on November 30, 2001.  *Id.*

11.  While assigned to the Fifth District, Plaintiff received an average rating for the evaluation period that ended in September, 2002.  *See* Exhibit W. p. 2.  Commander Greene evaluated Plaintiff for the 2001 to 2002 evaluation period.  *See* Exhibit B p. 20.

12.  On April 30, 2003, Plaintiff was deposed as a fact witness in a lawsuit filed by Ritchie.  *Id.*, p. 19; *see also*, Exhibit, Transcript of Plaintiff's April 30, 2003, Deposition, p. 1.

13.  Plaintiff received a rating for performance evaluation period ending September 2003; however, she did not recall but believed she received either an average or below average rating.  *See* Exhibit B p. 30.

14.  In October 2003, while Plaintiff was attending a class at the University of Maryland at College Park (UMCP), Commander Greene ordered Plaintiff to work the day tour.  *See* Exhibit B p. 68-69.

15.  At that time, Plaintiff's tour of duty was served at the leisure of the Commander Greene.  *Id.* p. 69.  Plaintiff testified that Greene needed her to work day work.  *Id.* p. 70.

16. Plaintiff also concedes that Greene, as the Commander was allowed to make that assignment. *Id.* Plaintiff did not file a grievance regarding the change of tour or the removal from her class at UMCP. *Id.*

17. In May 2004, Plaintiff believed that she was accepted into the Certified Public Manger's ("CPM") Program. *See* Exhibit B p. 57-58; *see also*, Exhibit W. However, in August 2004, after Plaintiff attended the CPM program at George Washington University for a week, she was removed from the program because her application was incomplete. *See* Exhibit B p. 60-61; *see also* Exhibit W.

In the evaluation rating period ending September 2004, Plaintiff received an average rating. *See* Exhibit B p. 115; *see also* Exhibit W p. 4.

18. On August 14, 2004, since Plaintiff had not been accepted to the CPM program, Plaintiff's pay status was AWOL for the forty (40) hours she attended the CPM program. *See* Exhibit B p. 63; *see also*, Exhibit W.

**B.**    **Plaintiff File EEOC Charge**

19. In 2004, Plaintiff filed an EEOC complaint alleging race discrimination in the work place. In her EEOC complaint, Plaintiff allegedly claimed employment, job and race discrimination. *Id.*

20. In January 2005, Plaintiff testified that she had an interview with the EEOC. The EEOC found that there was insufficient evidence to support Plaintiff's claim of race discrimination. *Id.* p. 22-23.

**C.**    **The Falsification of the Police Report**

21. Plaintiff worked on May 31, 2004, to June 4, 2004. *See* Exhibit H p. 468.

22. On June 17, 2004, Plaintiff voluntarily surrendered Kona, one of her German shorthair Pointer dogs, to the Animal Welfare League of Arlington ("AWLA").  *See* Exhibit E, Surrender Papers.

23. Plaintiff signed the surrender forms and presented a letter that she had prepared to the "prospective owner."  *Id.*; *see also* Exhibit F, the Letter.  Plaintiff claims that she prepared the letter because it was her intention to give Kona to her mother's friend.  *See* Exhibit H, p. 17.

24. In October 2004, Plaintiff contacted AWLA in an attempt to get her dog back.  *See* Exhibit G, Letter to Greene dated November 11, 2004.  *see also* Exhibit H, excerpts from Plaintiff's Office of Employee Appeal hearing transcript volumes I and II dated October 26, 2006, and November 17, 2006, p. 154.

25. Ms. Kay Speerstra, the Executive Director of AWLA, stated in a November 11, 2004, letter to Commander Greene that Plaintiff advised her (Speerstra) that Plaintiff's dogs, Kona and Swiss, had been stolen by Plaintiff's pet sitter from Plaintiff's house while she was on vacation.  *See* Exhibit B p. 153; *see also* Exhibit G.

26. On November 5, 2004, Plaintiff met with Speerstra and provided her with a PD – 251, a police report, as proof of the theft of the dogs and the burglary at her home.  *See* Exhibits G, H p. 154 -155; *see also* Exhibit I, Police Department PD – 251.  Exhibit H p. 154-155.

27. Speerstra reviewed the paperwork, which contained a letter that Plaintiff had written to the prospective owners who would adopt Plaintiff's dog, Kona.  *Id*.

28. On that same date, Ms. Susan Sherman and Mr. Art Schwartz, two AWLA employees, recognized the Plaintiff as the person who had brought the dog (Kona) to AWLA in June 2004, for adoption.  p. 157, 169.

29. At that meeting, Plaintiff never identified herself as a police officer.  Instead, she stated that she worked for Microsoft.  *Id.*157, 166, 169.  The police report also stated that Plaintiff worked at Microsoft.  *Id.*

30. During the November meeting, Plaintiff advised Speerstra that she used the internet and found out that her dog (Kona) had been adopted from AWLA in Arlington, VA.  *Id.* p. 157-158.

31. Speerstra found this assertion strange because, Plaintiff's dog (Kona) was adopted in late June or early July, 2004, - - - approximately two weeks after it was brought in, and any information about the dog would have been removed from the website at the time of the dog's adoption.  *Id.* p. 157-159.

32. According to Speerstra, only information about animals that need a home remains on AWLA's website.  *Id.* p. 158.

33. Concerned, Speerstra contacted Fourth District to find out information about the police report.  *Id.* p. 160.  An officer at the Fourth District could not find a record of the police report.  *Id.*  However, the officer who was helping Speersta, recognized Plaintiff's name and advised Speerstra that Plaintiff was a MPD employee who was assigned to the Fifth District.  *Id.* p. 161.

34. On November 11, 2004, Speerstra contacted the Fifth District regarding the Plaintiff.  *See* Exhibit J, Complaint Summary Sheet; *see also*, Exhibit H, p. 16, 153.  Speerstra stated that Plaintiff brought her dog, Kona, into the animal shelter for adoption in June 2004 and then contacted her several months later because she wanted the dog back.  *Id.* p. 16, 154.

35. A Sergeant from the Fifth District went to AWLA to retrieve the police department report (a PD -251, Exhibit I), the letter signed "Sonya" (Exhibit F), the letter to Greene dated

November 11, 2004, (Exhibit G), and copies of the surrender forms for Kona (Exhibit E). *See* Exhibit H, p. 17, 163. These documents were turned over to Commander Greene. *Id*. p. 17.

36. After reviewing the material, Commander Greene became suspicious about Plaintiff's conduct. The Commander believed that the police report was false, it appeared that it was written in Plaintiff's handwriting, and it stated that Plaintiff worked for Microsoft. *Id*. p. 17-18.

37. On November 11, 2004, Greene contacted Internal Affairs ("IA") and was advised by IA to place Plaintiff on "no-contact" status. *Id*. p. 17, 18-19; *see also* Exhibit K, Revocation/Restoration of Police Powers and Notice of Duty and Pay Status form.

38. On November 11, 2004, Plaintiff was placed on no-contact status. In other words, Plaintiff was permitted to work while in no-contact status. *See* Exhibit H, p. 20. However, her police powers were revoked and her badge, gun and ID folder were taken away. *Id*.

39. In November 2004, IA commenced an investigation to determine whether Plaintiff had falsified a police report. *See* Exhibit H. p. 19.

40. While Plaintiff was being investigated, she testified at trial in the civil lawsuit that had been filed by Sharon Ritchie *Ritchie v. D.C*. *Id*., p. 17. Ritchie had sued the District of Columbia alleging pregnancy and gender discrimination. *Id*.

41. On March 3, 2005, Plaintiff was interviewed by IA. Plaintiff denied that she surrendered her dog (Kona) to AWLA and stated that she was out of town from May 31, 2004, to June 4, 2004, when her two dogs were stolen by her pet sitter. *Id*.

42. Plaintiff does not recall the name of the dog sitter. *See* Exhibit B p. 146; *see also*, Exhibit H p. 475.

43. Plaintiff also claimed that the pet sitting service helped her locate her dogs (Kona and Swiss), and that she was able to get Swiss back. *See* Exhibit B p. 164-166; *see* Exhibit H p. 475. Plaintiff testified that she retrieved Swiss from an unknown location in the Maryland. However, Plaintiff refused to provide any information to IA regarding the petting sitting service that allegedly helped her recover "Swiss" because she was bound by a confidentiality agreement. *Id*. p. 475-477.

44. After the interview, the IA investigator requested Commander Greene to order Plaintiff to provide additional information and documentation to IA because Plaintiff was being uncooperative. *Id*. p. 17, 22.

45. On March 9, 2005, Greene gave Plaintiff a memorandum and ordered Plaintiff to report to IA on March 11, 2005, and provide IA with all requested documentation or information. *See* Exhibit L, Memorandum dated March 9, 2005; *see also*, Exhibit H, p. 22.

46. IA requested that Plaintiff provide, 1) the name, address and telephone number of the police agency that assisted her with the return of her dogs; 2) the name of the contact person in the police agency; and 4) the names, addresses, and telephone numbers of all of the Pet Sitting Services that she used in 2004. *See* Exhibit L.

47. Plaintiff did not report to IA on March 11, 2005. *See* Exhibit H p. 22, 25. Instead, Plaintiff requested eight hours of administrative leave on that day by leaving an envelope with a request for administrative leave in Greene's office. *Id*. p. 23.

48. Greene attempted to contact Plaintiff twice to discuss the request for administrative leave. *Id*. p. 24. However, Plaintiff did not return Greene's phone calls. *Id*.

49. Greene denied Plaintiff's request because Plaintiff had not followed proper procedure. *Id*. p. 23, 24. Additionally, Plaintiff did not report to her shift that same evening and was declared absent without leave ("AWOL") for that work day. *Id*. p. 25.

50. On March 12, 2005, AWLA employee Susan Sherman positively identified Plaintiff from a photo array as the person who surrendered her dog (Kona) in June 2004. *See* Exhibit O, photo arrays.   On that same date, another AWLA employee, Art Schwartz, also positively identified Plaintiff from a photo array as a person he assisted in the summer of 2004. *Id*.

51. On March 15, 2005, Plaintiff failed to report to work. *See* Exhibit H p. 30. Plaintiff did not return to work until March 29, 2007. *Id*. p. 30-31, 185.

52. During this period of time, Commander Greene attempted to contact Plaintiff and left several messages on her home and cell phones and departmental pager. *Id*. p. 30-31. However, Plaintiff failed to return any of Greene's messages. *Id*.

53. On March 29, 2005, Greene prepared a final investigative report for an adverse action (CS# 05-0447) regarding Plaintiff's AWOL for eight (8) hours on March 11, 2005. *Id*. p. 26, 183-184; s*ee also* Exhibit M, report dated April 7, 2005.

54. The following day, Commander Greene also prepared a final investigative report and recommendation for an adverse action (CS# 05-0448) on Plaintiff for being AWOL from March 13, 2005 to March 26, 2005 for eighty (80) hours. *See* Exhibit H p. 35; *see also*, Exhibit N, report dated April 7, 2005.

55. Greene surmises that Plaintiff did not report to work from March 13, 2005, to May 26, 2005, because Plaintiff incorrectly believed that she was serving a suspension. Greene could not

confirm Plaintiff's beliefs because Plaintiff failed to return Greene's messages.[10]  *See* Exhibit H p. 30-31, 34–35.

56. On March 29, 2005, Inspector Matthew Klein, Director of IA, ordered Plaintiff to respond to IA and provide his department with the outstanding requested information.  *See* Exhibit H p. 185.

57. Plaintiff reported to IA but refused to answer IA's questions.  *Id*. p. 175.  IA investigator Theresa Ostazeski conducted the investigative interview.  After her investigation, Ostazeski found the following:

   a.  the PD - 251 was fraudulent and that the CCN# 147-113 was actually assigned to a different report for an attempt to locate and not a burglary;

   b.  the officer who allegedly prepared the PD 252, badge #3671, did not exist and the badge number was not assigned to anyone;

   c.  the sergeant who allegedly signed the PD 251, Brown, badge #S331, did not exist at Fourth District and the badge number was assigned to Sergeant Wayne Rimal who was assigned to the Forensic Science Division and not the Fourth District;

   d.  no detective by the name of Ivey worked at Fourth District at that time.  There were two MPD members named Ivey who worked in S.O.C.C., and the Harbor;

   e.  No technician named Gainer was assigned to Forensic Science at the time of the alleged theft and the only MPD member named Thomas Gainer worked for Fifth District;

---

[10] Prior to the IA investigation, Plaintiff was disciplined as a result of being AWOL for forty (40) hours when Plaintiff attended a program she was not approved for.  *Id*. p. 33.  Plaintiff received a copy of the suspension letter that notified Greene that Plaintiff would be suspended effective March 13, 2005, unless the imposition of the suspension created operational difficulties for the unit.  *See* Exhibit N.  At that time, it was Commander Greene's intention that Plaintiff would start her suspension after IA completed their inspection so not to create operational difficulties for IA.  *See* Exhibit H p. 34, 39-40.  Commander Greene stated that as a Captain, Plaintiff should have known that her suspension would not have begun on March 13, 2005, because Plaintiff had not been served with a PD77 (Revocation/Restoration of Police Powers and Notice of Duty Status) form, and all attempts to contact Plaintiff from March 13, 2007, to March 28, 2007, failed.  *Id*. p. 37-41.

    f.    The property book number 118, which is listed on the PD 25, did not match any Fourth District property book that was in use during that time period;

    g.    A check of the CCN logbook reveals no call for service or report taken for 1325 Ingraham Street, Northwest, which is Captain Owens' residence, during 2004;

    h.    A computer check of WALES (Washington Area Law Enforcement System) revealed that there were no calls for police service by any complainant named S. Owens or Sonya Owens, at 1325 Ingraham Street, Northwest, during 2004;

    i.    A comparison of the handwriting on both the AWLA.'s surrender forms and the D.C. Animal Shelter's adoption form appeared to be identical to known samples of Captain Owens' handwriting;

    j.    Staff members immediately identified Sonya Owens as the person who came to the AWLA in October, and who also had surrendered the dog (Kona) earlier in June;

    k.    Captain Owens listed Microsoft as her employer on the PD 251; and

    l.    Captain Owens purported that she was out of town when her house was burglarized and her dogs stolen from May 31, 2004 to June 4, 2004. The PD 251 that she presented to the AWLA reflects a time period from 1400 hours on May 31, 2004 until 2230 hours on June 4, 2004.

    m.    According to TACIS (Time & Attendance Court Information System), Captain Owens worked the following hours:

        0730 to 1600 hours on Tuesday, June 1, 2004
        0730 to 1600 hours on Wednesday, June 2, 2004
        0730 to 1600 hours on Thursday, June 3, 2004
        0930 to 1800 hours on Friday, June 4, 2004

*See* Exhibit P, final investigation report and recommendation dated April 4, 2005.

58. At the conclusion of her investigation, Ostazeski recommended that the charges against Plaintiff be sustained and that Plaintiff be cited for adverse action as a result of those charges. *Id*. On April 4, 2005, IA prepared a final investigative report and recommendation for an adverse action (CS# 04-1880) as a result of IA investigation regarding AWLA. *Id*.

40

**D.**    <u>**Disciplinary Action Taken Against Plaintiff For Falsifying Documents**</u>

59. On May 3, 2005, Plaintiff was served with a Notice of Proposed Adverse Action to terminate her employment with MPD.  *See* Exhibit Q, Notice dated April 25, 2005.  The notice informed Plaintiff that she had twenty-one days to submit a response and state whether she desired a hearing.  *See* Exhibit H p. 189–190. In the interim, by notice dated August 12, 2005, Plaintiff served her notice of intent to file a lawsuit against the District pursuant to DC Code §12-309.  *See* Exhibit W.

60. Plaintiff's hearing on the charges against her was held on August 15, 2005, and September 12, 2005.  *See* Exhibit H p. 190.

61. Plaintiff filed this civil action on August 31, 2005.  *See* Complaint.  Plaintiff failed to attend the September 12, 2005, hearing, and the charges were heard before a panel in Plaintiff's absentia.  *See* Exhibit H, p. 190.

62. On October 14, 2005, after the conclusion of Plaintiff's August and September 2005, hearings, the panel found Plaintiff guilty by a preponderance of the evidence on the charges of:

    a.  Fraud in securing appointment of falsification of official records or reports;

    b.  Untruthful statement;

    c.  Willfully disobeying orders or insubordination;

    d.  Conduct unbecoming an officer; and

    e.  Conviction; and

    f.  AWOL.

*Id*. The panel determined that Plaintiff's employment would be terminated effective November 25, 2005.  *See* Exhibit R.

63. Plaintiff was served with the final notice of adverse action.  *Id*.  The notice informed Plaintiff that she had ten (10) days to appeal this action to the Chief of Police.  *Id*.  On October 24, 2005, Plaintiff filed an employee appeal to Chief of Police Charles H. Ramsey challenging the decision to terminate her employment from MPD.  *See* Exhibit T, Plaintiff's appeal.

64. On November 10, 2005, Chief Ramsey denied Plaintiff's appeal.  *See* Exhibit U, Ramsey's November 10, 2005, denial.  On November 28, 2005, Plaintiff appealed to the Office of Employee Appeals ("OEA").  *See* Exhibit V.

65. Plaintiff does not have an adverse action.  There has been no final determination regarding the OEA appeal of the notice of adverse action because Plaintiff's appeal is currently pending before the OEA.  *Id*.

66. In February 2005, Plaintiff was notified by MPD and received a subpoena to testify at the *Ritchie v. D.C.*  Plaintiff testified on that same day.  *See* Exhibit B p. 17; *see also* Exhibit W.

Respectfully submitted,

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General,
Civil Litigation Division

          */s/Phillip A. Lattimore*
PHILLIP A. LATTIMORE, III [422968]
Chief, General Litigation Sec. III

          */s/Nicola N. Grey*
NICOLA N. GREY [492150]
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 724-6626; (202) 727-6295
(202) 727-3625 (fax)
E-mail:  nicola.grey@dc.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SONYA OWENS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **CV-05-1729 (AK)** |
| **DISTRICT OF COLUMBIA,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## ORDER GRANTING DEFENDANT DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

Upon consideration of the District's Motion for Summary Judgment, and opposition

thereto and the facts and law considered, it is this ____ day of _____, 2007,

**HEREBY ORDERED** that the District's Motion is **GRANTED**; and it is further

**ORDERED** that summary judgment is granted in the District's favor.


_____
The Honorable Alan Kaye
United States Magistrate Judge

43