# Law Office of Jimmy A. Bell, PC
9610 Marlboro Pike ~ Upper Marlboro, MD 20772
Phone (301) 599-7620 ~ Fax (301) 599-7623
Website: www.jimbellesq.com
Email: jimbellesq@aol.com



AUG 1 2 2005

August 12, 2005

**Deliver via Courier**
Phyllis Dailey, Claims Bureau Manager
Claims Division
D.C. Office of Risk Management
441 4th Street, NW – Room 800 South
Washington, D.C. 20001

Re:   Notice of Intent to File a Lawsuit Against the District of Columbia
      Government for Negligent Acts, Retaliation, and Violation of Civil Rights
      Against Captain Sonya Owens, MPD

Dear Ms. Dailey:

This letter represents a notice of intent to file a lawsuit against the District of Columbia Government for negligence, federal and state civil rights violations, and retaliation for being a witness in a federal civil rights case on behalf of my client, Captain Sonya Owens, MPD.

In June 2001, Sonya Owens was interviewed by the EEOC, as a witness in the complaint of Officer Sharon Ritchie and Tracie Jones that alleged, among other things, gender and pregnancy discrimination against Commander Willie Dandridge (Sixth District). In the complaint, she testified (with Beverly Johnson representing MPD) that both officers had received disparate inequitable treatment, which included violations of Department policies. Prior to that, she told Chief Ramsey (in a meeting for women officers held at Howard University Law School) that the officers' medical paperwork alleged to have been misplaced by Sixth District Administrative Staff was properly submitted personally by Ms. Owens and that no one at the Sixth District had made her aware that they had not received copies. Subsequently, Officer Lovell (Acting Sergeant) admitted that he removed their paperwork from the Administrative Section, and then told Commander Dandridge that Owens had not submitted the paperwork. The officer also forged documents in support of his false claims. Officer Lovell was promoted to sergeant and assigned a premium position.

In September 2001, Ms. Owens was abruptly transferred from the Sixth District to the Fifth District, in spite of telling Commander Dandridge that she did not want to be transferred. Prior to that time Ms. Owens was told, that she was not a "team player". Her paperwork suddenly became unacceptable, she was removed from conducting



Commanders' conferences, and she was disallowed to acquire a "take home vehicle." The last Commander's conference Ms. Owens held dealt with two School Beat officers who were charged with adverse action for leaving their beats to meet with Commander Dandridge. The investigation was written by (now retired) Lieutenant Robert Moss and approved by Captain Victor Brito. Ms. Owens rescinded the charges and reduced it to corrective action for not properly notifying an official, as they had been instructed to do in the past. However, their request to meet the Commander was approved by him and he told them to report to his office. The officers advised the dispatcher that they were leaving their beat to go to Dandridge's office. Captain Brito was very angry about Ms. Owens' decision, particularly after she told him that a Commander outranks all captains. Commander Dandridge's decision to meet with the officers superseded any directives by Captain Brito that the officers must meet with him first or notify him of any such requests prior to approval.

In June 2002, Ms. Owens was urgently contacted by the Department with respect to appearing at a deposition hearing for Officer Sharon Ritchie regarding her EEO lawsuit against the Department and Commander Willie Dandridge. At that time, the Department claimed that it did not know where Ms. Owens was.

In September 2002, Ms. Owens received an "average" performance rating from Commander Willie Dandridge. All 3 of her PSA's had crime reductions; she worked with citizens to revive and produce the Sixth District Neighborhood Watch Program. She also developed and ran one of the most successful Vehicle Take Home programs. Ms. Owens was in charge of the Power Shift, the station, 3 PSA's, Missing Persons Unit, Mountain bike Officer Program, Warrant Squad, and for a very brief moment – 6D Detectives (to name a few). Her supervision of the detectives ended after 10 days when she discovered that they had one detective who had not closed a case in 3 years, and, after she held a meeting with all of them to say that their 10% closure rate had to increase dramatically to at least 60%.

In October 2002, Commander Greene stated that Ms. Owens was attending too much outside training and from then on, she would have to make her requests through Greene and receive her approval before applying for the training. At that time, she was attending the Executive School Resource Officer training given by the National Center for Missing and Exploited Children in Alexandria, VA.

In August 2003, Ms. Owens submitted an application for the Certified Public Manager's (CPM) Program Cohort 17 to Commander Greene. In September 2003, she contacted the Center for Workforce Development (CWD) and found that they had not received her application. She submitted it again to the Commander. In October 2003, Ms. Owens submitted it again and hand-delivered her portion of the application directly to CWD. Commander Greene was given the supervisor's portion again to complete.

In October 2003, Commander Greene called Ms. Owens while in class at UMCP and stated that she needed her to report to work right away and to work the day work tour for the remainder to attend to matters at the Fifth District as her first priority. Therefore,

Ms. Owens would not be able to finish attending college classes for the semester. Afterwards, she had to submit a request to Greene for approval to attend college classes despite the Mayor's Memorandum and working with Mr. Fitz Evans (the Department's college courses coordinator).

In January 2004, Ms. Owens met with Commander Greene for a Resolution Hearing regarding a pending adverse action against her for failing to submit numerous administrative investigations. At the time, she was told that these adverse action cases against the lieutenants/captains were made at the request of the Executive Assistant Chief Michael Fitzgerald. Ms. Owens challenged the process and the fact that all of these cases were late because Commander Greene and Assistant Chief Brian Jordan reviewed the investigations late and perpetually rejected them for minor mistakes or for capricious and arbitrary reasons, in addition to other reasons. During this meeting, Ms. Owens saw no paperwork other than the resolution worksheet that stated 10-day suspension. She signed the paperwork because she knew that an appeal would go thru EAC Fitzgerald – in other words, it would be pointless.

In May 2004, Ms. Owens was notified of her acceptance into the CPM program by the Center for Workforce Development.

In July 2004, Ms. Owens refused to sign an amended version of her FY2004 Performance Evaluation Contract. The new version changed the crime reduction percentage goals, changed her Individual Development Plan goals that included omitting her intention to participate in the CPM program and that she had already submitted an application, among other things. The new contract also stipulated that Ms. Owens would work to develop a partnership program with area ministers that would allow them to enter crime scenes to counsel victims, without being requested to do so. She refused citing the Constitutional requirement of separation of church and state, in addition to the pending liability of allowing non-law enforcement persons to enter private property without the owner's unsolicited requests or permission.

In August 2004, Ms. Owens was notified by Mr. Erol Arthur that she was removed from the CPM program and replaced SOLELY because the Department failed to submit its portion of her application package. This portion of the application had to be submitted by the Dept., under separate cover, directly to the Center. When Ms. Owens questioned being interviewed, notified, attending classes, taking class pictures, receiving study materials, etc. Mr. Arthur stated that all of this occurred in spite of them not receiving the Dept's portion because they felt that it was a mere oversight. Chief Ramsey had always strongly endorsed the program and had sent several MPD managers through the program; and, no one, or agency had ever refused to allow their employees to participate in the program. Ms. Owens spoke to the DC Personnel and they said the same thing – it was endorsed by the Mayor, the City Administrator, and all agencies – the city paid the tuition for its employees. Commander Greene denied ever receiving the application until Ms. Owens told her that Mr. Arthur had personally delivered another copy to her in June 2004 and it was received by Captain Scott, who in turn stated that he placed it in her hands.

On August 14, 2004, the 5th District Time and Attendance clerks stated that Commander Greene ordered them to change Ms. Owens pay status to AWOL for the week of CPM training that she received. She filed a grievance with A/C Jordan who stated that my training was not approved by the Chief. Ms. Owens also appealed to A/C Shannon Cockett who stated that there were no repercussions when the Command Staff refused to follow policy or protocols. Therefore, consequently, when Commander Greene finally admitted that she did not forward my application for the CPM program because she "didn't think Ms. Owens deserved to or was good enough to go," nothing happened.

In September 2004, Ms. Owens almost received a "below average" rating, citing once again the EEO complaint when she threatened to pursue the legality of doing so. Instead, Ms. Owens got an "average" rating. The Commander had a stack of paperwork, which she said were complaints against Ms. Owens that she held back because she "didn't want to see her get into trouble", but used to justify her ratings. Ms. Owens told her to send them through because she wanted the opportunity to address those complaints. Among other things, the performance evaluation includes quotes Marcia Holt (?), an MPD employee who says that she attended a meeting hosted by someone else, who allegedly worked for Ms. Owens and that this person's presentation was not good. Commander Beach's complaint that Ms. Owens rescinded a request for the helicopter to search for a black male suspect shot at after he allegedly tried to run over one of the commander's plainclothes officer. She told the Commander on the scene and in a written statement. When Ms. Owens questioned the officer, the only description he could give was that he was a black male last seen driving his car in an unknown direction. The car was found abandoned 2 blocks away with no witnesses, including an overtime detail of officers that were conducting a traffic roadblock 3 blocks away – who saw nothing and heard nothing. Therefore, we had nothing upon which to base a search or stop someone – "a black male"- was not good enough. Besides, Ms. Owens called K9 to see discover a tracking trail from the car.

In October 2004, Ms. Owens filed a complaint with EEOC against MPD.

In November 2004, Ms. Owens was placed on "non-contact" duty by Commander Greene, who cited receiving a telephone call from the Executive Director of the Arlington Animal Shelter. Owens was ordered not to visit or speak to anyone at the shelter.

In January 2005, Owens was served with a notice of proposed suspension for 20 days, plus an additional 5 days, for overdue correspondence. She appealed to the Chief.

In February 2005, the Department urgently contacted Ms. Owens pursuant to a Federal Judge's request that she appear to testify in the 2002 lawsuit filed on behalf of Officer Sharon Ritchie, against MPD. Apparently, the Department had problems locating her despite the fact that she was working everyday at the 5th District. Sonya Owens was interviewed by the EEOC, as a witness in the complaint of Officer Sharon Ritchie and Commander Willie Dandridge (Sixth District). In the complaint, she testified that both

4

officers had received disparate inequitable treatment, which included violations of Department policies. In addition, in February she was served with the Chief's answer to her appeal that reduced the suspension to 10 days, beginning March 13 thru March 26th.

In March 2005, Internal Affairs/OPR contacted Ms. Owens regarding the Arlington Animal Shelter complaint. During the first interview, the Department refused to tell her the nature of the complaint, the underlying allegations of misconduct, or the charges presented to the US Dept. of Justice that resulted in a letter of declination. Finally, they admitted that they did not know what the allegations of misconduct were because they had not written the investigation. At the conclusion of that interview, Lt. Charity told Ms. Owens that they were acting on behalf of the animal shelter by telling her that she was forbidden to return to that shelter and that if she did, she would be arrested. Ms. Owens then asked him "why" and he said because of this situation. She told the Lt. that if she was being banned then there should be some legal paperwork or court order stating so. He said that there was not because it was private property. Ms. Owens responded that it was a shelter ran by that municipality – a public facility – that required a court order to ban anyone. He told Ms. Owens, "I'm telling you like I tell other people – do what you can stand. You're a captain, so do what you can stand." The banning portion was stated after the tape was turned off and as Ms. Owens was about to leave.

On March 9th, Commander Greene served Ms. Owens with a written order that directed her to return to OPR on March 11th and provide answers to 3 very specific questions that came out of her confidential interview. Ms. Owens' immediate reaction was that OPR violated its own confidentiality policy and bypassed its entire chain-of-command to tell Commander Greene, a witness in this investigation, the contents of her interview. Ms. Owens wrote a letter to Commander Greene telling her about this breach and provided a copy to the Agent on the day of that interview. She also wrote a letter requesting 8 hours of leave in order to obtain legal advice. Commander Greene left a message stating that since Owens did not meet with OPR at 10am she saw no reason for her to see a lawyer and her request was denied. Later, OPR left a message ordering Ms. Owens to go their office to be interviewed and they were acting on behalf of Commander Greene. During both OPR interviews, Owens requested copies of the audiotaped interviews.

On March 12th, Ms. Owens worked a full tour at the 5th District. Commander Greene came to her office and asked for a statement regarding her AWOL for 8 hours on the previous day. She told the Commander that she had requested 8 hours of leave to seek legal advice and that she was entitled to 2 hours of Overtime as "call back" for being at OPR at 10 am and her office during my off-duty hours. Therefore, if she were going to charge Ms. Owens then it would be for 6 hours. She stated that it would be for 8 hours since Ms. Owens requested 8 hours of leave.

On March 13-26th, Ms. Owens served her suspension. On March 16th, she filed an appeal with OEA. On March 29th, Owens returned to work and 15 minutes later the Commander gave her a copy of her email message from Inspector Klein, directing her to respond to OPR at 1500 hours – it was 1415 hrs. Then, Greene attempted to conduct a

Resolution Hearing on a pending adverse action. Ms. Owens told her that she needed to leave to go to OPR and she made a copy of the investigation. After meeting with OPR, Ms. Owens returned and told the Commander to forward the investigation to DDRO because she was not going to negotiate any terms. Then the Commander handed Ms. Owens a leave slip for 80 hours during the period that she served her suspension. Owens then stated that she was not signing it because she was not on vacation and that if she took her leave, Ms. Owens was filing a grievance. Commander Greene stated that she would in turn charge Owens with AWOL because she was not served a PD77 Revocation of Police Powers. Ms. Owens told her that the suspension was directed by the Chief and that a PD77 was not necessary because her powers were revoked in November 2004. Furthermore, there was nothing in the policies that stated that failing to serve a PD77 nullified and voided a suspension. In addition, if a PD77 was needed why didn't Commander Greene serve Ms. Owens on March 12th the day before her suspension?

In April 2005, Ms. Owens was charged with 80 hours of AWOL and suspended again for 10 days. She submitted a supplement to her appeal with OEA that included this matter.

In May 2005, Ms. Owens was served with a proposed notice of termination regarding the Arlington Animal shelter complaint, 8 hours AWOL on March 11th and 80 hours AWOL for March 13-26th. She had 21 days to request a hearing and the hearing date was already set on the 22nd day. In the meantime, Ms. Owens served two written requests to the Dept. asking for additional missing information such as all of the audiotaped interviews, statements from all witnesses, missing attachments, etc. Those requests were ignored. Councilmember Fenty asked the Department to provide the information – it was ignored. Mr. Ted Williams (her former attorney) requested additional information – it was ignored. The DC Attorney General's office forwarded Ms. Owens request for additional information to the Dept. – it has been ignored. The DC Attorney Generals Office FOIA officer forwarded her request to the DC Animal Control Agency/Dept. of Health – they refused to comply with her FOIA request. Two days after being served by the Department, Ms. Owens received an anonymous letter from Animal control/Dept. of Health that stated that their records showed that her dog license purchased in Feb. expired in 2005 and to send veterinarian information by June 28th.

On behalf of my client, Captain Sonya Owens, a claim of negligence, federal and state civil rights violations, and retaliation for being a witness in a federal civil rights case is therefore being made against the District of Columbia Government for the sum of two million dollars. If you have any questions, please feel free to contact me.

Sincerely,

Jimmy A. Bell, Esq.